**GENERAL ELECTRIC COMPANY,**

v.

**The UNITED STATES.**

**No. 429–76.**

United States Court of Claims.

Nov. 14, 1979.

See also, Ct.Cl., 610 F.2d 739.

M. Bernard Aidinoff, New York City, attorney of record, for plaintiff; Charles E. Dorkey, III, Sydney E. Unger, and Sullivan & Cromwell, New York City, of counsel.

Bruce W. Reynolds, Washington, D. C., with whom was Asst. Atty. Gen., M. Carr Ferguson, Washington, D. C., for defendant; Theodore D. Peyser and Donald H. Olson, Washington, D. C., of counsel.

Before KASHIWA, KUNZIG and BENNETT, Judges.

1. This case was consolidated for purposes of argument, and the opinion issued concurrently, with *AMF Inc. v. United States,* Ct.Cl., 610 F.2d 739 (1979). In reaching our decision, we have considered the arguments presented by counsel in both cases.

2. A "controlled foreign corporation" is defined by I.R.C. § 957 as any foreign corporation of which more than 50 percent of the total combined voting power of all classes of stock is owned or considered as owned by United States shareholders on any day during the taxable year of such foreign corporation.

   "Ownership" is determined under I.R.C. § 958.

## OPINION

KASHIWA, Judge:

This income tax case comes before the court on the parties' stipulation of facts. General Electric Co. (GE) seeks a refund for taxes and interest paid for its 1966 tax year. The issues presented in this case[1] involve interpretation of the regulations promulgated under I.R.C. § 963. We must decide whether plaintiff was correct in applying the special rules of Treas.Reg. § 1.963–4 in determining the amount of its foreign tax credit on distributions received from foreign corporations covered by an election under I.R.C. § 963 and whether it properly attributed a distribution received from a foreign corporation in 1967 to the 1966 tax year and properly deemed that distribution to be from the 1966 earnings and profits of the distributing corporation under Treas.Reg. § 1.963–3. After considering the written submissions of the parties and their oral presentations, we hold for the Government.

### I. *Statutory Background*

An appreciation of the problems raised in this case requires a general understanding of those parts of the Internal Revenue Code which ordinarily determine the taxation of United States shareholders of controlled foreign corporations.[2] I.R.C. § 951 requires a United States shareholder that owns 10 percent or more of the stock of a controlled foreign corporation[3] to include in its gross income its pro rata share of the subpart F income of the controlled foreign corporation.[4] Thus, under ordinary circumstances,

3. I.R.C. § 951 excludes from its coverage those foreign corporations which are not "controlled" under I.R.C. § 957 for an uninterrupted period of 30 days or more during the taxable year.

4. Subpart F income is defined in I.R.C. § 952. It is composed of "foreign base company income" (section 952(a)(2)), defined in section 954. Very broadly stated, "foreign base company income" consists of: (a) foreign personal holding company income (computed as though the company were a foreign personal holding company, as defined in section 553, modified and adjusted by section 954(c)(2), (3), and (4)); (b) foreign base company sales income (income from the purchase or sale of personal proper-

a United States shareholder of a controlled foreign corporation is taxed on its pro rata share of the subpart F income of the controlled foreign corporation without regard to whether this income is actually distributed to the shareholder during the taxable year.

Until its repeal,[5] I.R.C. § 963 provided an exception to taxation under section 951. A corporate United States shareholder that qualifies for treatment under section 963 is excluded from the coverage of section 951, and is not taxed on its pro rata share of the subpart F income of controlled foreign corporations. Such a shareholder is only taxed on distributions actually received during the taxable year.

In order to qualify for treatment under section 963, every corporation must (1) file an election to be covered by that section of the Code, (2) consent to the regulations promulgated under section 963(f); and (3) receive a statutorily determined distribution of the earnings and profits of the foreign corporations covered by its election. The section 963 election may extend to (a) one or more first tier controlled foreign corporations, (b) two or more controlled foreign corporations connected in a chain of stock ownership, (c) the group consisting of all controlled foreign corporations, or (d) the group consisting of all controlled foreign corporations other than certain less developed country corporations.

The distribution of the earnings and profits of the foreign corporations included in an election that the shareholder must receive under section 963 is called the minimum distribution. The amount of the minimum distribution equals a varying percentage of the earnings and profits of the foreign corporations covered by the section 963 election. The minimum distribution formula was designed so that the sum of the amount of foreign tax paid by the distributing corporation that was attributable to the minimum distribution and the amount of United States tax paid by the electing shareholder on the minimum distribution would equal approximately 90 percent of the amount the electing shareholder would pay if it were taxed at United States rates on its proportional share of the pretax earnings and profits of the foreign corporations covered by its election.[6]

The amount of the minimum distribution for a particular taxable year is determined by reference to the appropriate statutory table in section 963(b). For the tax year at issue in this case, the table found in section 963(b)(3) controls. The percentage of earnings and profits of the foreign corporations covered by the election which must be distributed is a function of the effective foreign tax rate of those corporations.[7] There is an inverse relationship between the effective foreign tax rate and the percentage of the earnings and profits of the foreign corporations covered by the election that must be distributed. Under the table in section 963(b)(3), when the effective foreign tax rate is 43 percent or higher no minimum distribution is required. Under these circumstances, an electing corporation obtains the section 963 exclusion without receiving any distribution from the foreign corporations covered by its election.

---

ty); c) foreign base company services income (income from technical, managerial, or other skilled services); and (d) foreign base company shipping income (income attributable to use, hiring, or leasing of aircraft and ships in foreign commerce, or performing services directly related to such use, or to disposition of any such asset).

Section 952(a)(1) also provides that income derived from the insurance of United States risks (determined under section 953) is subpart F income.

**5.** I.R.C. § 963 was repealed by the Tax Reduction Act of 1975, Pub.L.No.94–12, § 602(a)(1), 89 Stat. 26 (1975).

**6.** See S.Rep.No.1881, 87th Cong., 2d Sess. 88 (1962), U.S.Code Cong. & Admin.News, p. 3304, Conf.Rep.No. 2508, 87th Cong., 2d Sess. 34 (1962); Treas.Reg. § 1.963–1(a)(1).

**7.** The effective foreign tax rate for a chain or group of corporations is that percentage which is the result of the division of the electing shareholder's proportionate share of the consolidated foreign taxes paid or accrued by the foreign corporations covered by the election, by the electing shareholder's proportionate share of the pretax earnings and profits of those foreign corporations. See Treas.Reg. § 1.963 - 2(c)(2), (d)(2), (d)(3), (e)(1), (e)(2).

Ordinarily, a distribution is treated as received in that taxable year in which the shareholder receives it. Treas.Reg. §§ 1.301–1(b) and 1.902–1(a)(8). Because of the special significance of a minimum distribution, however, Treas.Reg. § 1.963–3(a) allows a shareholder which receives a distribution from a foreign corporation covered by a section 963 election in the taxable year following the election year to treat that distribution as received within the taxable year of the election if it is received within 180 days of the close of the election year and is made within the distribution period of the foreign corporation relating to the election year. Under Treas.Reg. § 1.963–3(c), such distributions are deemed to come from the earnings and profits of the foreign corporation that relate to the taxable year of the election.

## II. *Facts*

Plaintiff is a New York corporation with its principal place of business in Fairfield, Connecticut, using the accrual method on a calendar year taxable year. For the 1966 tax year GE made a valid group election under section 963. The effective foreign tax rate was over 43 percent, thus GE was not required to receive any distribution from the foreign corporations covered by its election in order to use the section 963 exclusion. GE received $7,451,404 in distributions in 1966 from foreign corporations covered by its election. It also received a distribution of $76,776 from a foreign corporation covered by its election within the first 60 days of 1967. In its 1966 corporate tax return, plaintiff treated this latter distribution as received in 1966 and paid out of earnings and profits attributable to 1966. In determining its foreign tax credit on these distributions, plaintiff applied the special rules of Treas.Reg. § 1.963–4(b) and (c).

After audit and examination of plaintiff's return for 1966, the Internal Revenue Service asserted a deficiency on the ground that the regulations cited above did not apply to the distributions received by plaintiff because such distributions were not part of a minimum distribution under section 963. Plaintiff paid the deficiency and related interest and brought this refund suit after the Service disallowed its claim for refund.

## III. *Positions of the Parties*

Plaintiff argues that the authority granted to the Secretary of the Treasury to vary the foreign tax credit rules by section 963(f) was not limited to the determination of the foreign tax credit in respect to the minimum distribution. It contends that the language of the regulations at issue in this case clearly indicates that they apply to the full amount of the distribution received by an electing shareholder from a foreign corporation covered by its election. Plaintiff takes the position that the failure of the regulations to differentiate between the minimum distribution and distributions in excess of that statutorily determined amount indicates that the regulations were intended to control all distributions. It argues that the Government's interpretation is contrary to the plain meaning of the regulations. It further contends that any requirement that it apply one set of rules to the minimum distribution and another set of rules to distributions in excess of that amount would impose a heavy administrative burden contrary to the Congressional purpose in enacting section 963.

Defendant takes the position that the legislative history shows that the Secretary's authority to vary the foreign tax credit rules was limited to the determination of the foreign tax credit on the minimum distribution. It argues that the regulations, when read as a whole and in the context of the statutory purpose, are limited in application to the minimum distribution. It contends that to apply the regulations in the manner proposed by plaintiff would result in a windfall for plaintiff which was not intended either by Congress or the drafters of the regulations.

## IV. *Discussion*

The parties agree that our decision in this case is dependent on the proper

interpretation of the regulations promulgated pursuant to the grant of authority in section 963(f). Those regulations are legislative in character and have the force and effect of law. In determining the meaning of such regulations, rules of interpretation applicable to statutes are appropriate tools of analysis. *See Rucker v. Wabash R. R. Co.*, 418 F.2d 146 (7th Cir. 1969); C. Sands, *Sutherland Statutory Construction* § 31.06 (4th ed. 1972). The meaning of particular terms is to be derived not only by consideration of the words themselves but also by examination of the context, the purpose, and the circumstances under which the terms are used. *See Sea-Land Service, Inc. v. United States*, 493 F.2d 1357, 204 Ct.Cl. 57, *cert. denied*, 419 U.S. 840, 95 S.Ct. 69, 42 L.Ed.2d 67 (1974); *Irving Berlin Music Corp. v. United States*, 487 F.2d 540, 203 Ct.Cl. 1 (1973), *cert. denied*, 419 U.S. 832, 95 S.Ct. 57, 42 L.Ed.2d 58 (1974).

## A. Legislative History

■ The parties have focused their arguments with respect to legislative history on the question of the Secretary's authority to vary the foreign tax credit rules pursuant to section 963(f). We find that the legislative history which relates to this issue is, at best, sketchy and ambiguous. The Government places great reliance on remarks made by Senator Kerr on the floor of the Senate which tend to support its position that the authority was limited. Senator Kerr was a member of the Senate Finance Committee and was the only Senator to make any extended remarks concerning section 963(f). While we believe that Senator Kerr's remarks are helpful in illuminating the Congressional understanding of what adjustments the Treasury would make, we cannot conclude, based on a single remark in the midst of a complex debate, that Congress intended to strictly limit the Treasury's authority. The remarks of a single legislator, even one as influential as Senator Kerr, are not *controlling* in analyzing legislative history. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979).

The legislative history is important, however, as a background for our interpretation of the regulations at issue in this case. Both section 951 and section 963 were enacted as part of the Revenue Act of 1962, Pub.L.No.87–834, 76 Stat. 960 (1962). Section 951 was a significant change from the traditional taxation of foreign source income. It was highly controversial and engendered strong debate on both sides, including attacks on its constitutionality. The provision was designed to end tax deferral[8] on tax haven operations[9] of foreign corporations that were controlled by United States shareholders. It achieves its purpose by imputing to United States shareholders of controlled foreign corporations a share of the earnings and profits of those corporations derived from tax haven operations (subchapter F income) even if it is not actually distributed. Thus, under section 951, a shareholder is immediately taxed on its share of the controlled foreign corporation's subchapter F income, and tax deferral is eliminated.

There was little debate on section 963. The provision was added by the Senate Finance Committee as an amendment to the bill which had been passed by the House of Representatives. The Senate Report refers to section 963 as an escape valve which, if complied with, made section 951 inoperative.[10] Like section 951, it was designed to eliminate tax deferral, but it utilized a dif-

---

**8.** Tax deferral was possible under the previous law because United States shareholders of controlled foreign corporations were only taxed on the earnings and profits of such corporations when they received a dividend distribution. If the controlled foreign corporation accumulated earnings and profits rather than making distributions, there was no tax on the United States shareholder. *See* Senate Report, *supra* note 6, at 78.

**9.** Tax haven operations was a reference to a certain category of activities such as trading, licensing, and insurance which could be easily organized such that the resulting income would be collected and taxed in certain countries with low tax rates. *See* Senate Report, *supra* note 6, at 79.

**10.** Senate Report, *supra* note 6, at 80.

ferent method. As we noted above,[11] the minimum distribution formula was designed to require the electing shareholder to receive a distribution of the earnings and profits of the foreign corporations included in its election that would result in an overall tax which would approximate the amount the shareholder would pay if it were taxed at the United States rates on its proportional share of the pretax earnings and profits of those foreign corporations. The overall tax includes the foreign tax paid by the distributing corporation in respect to the distribution and the United States tax paid by the shareholder on account of its receipt of the distribution. Thus, under section 963, tax deferral is controlled by requiring an electing shareholder to receive a distribution that produces a predetermined level of overall taxation.

Because section 963 is designed to achieve a specific level of overall taxation on the required distribution, the foreign tax credit which may be claimed by the shareholder receiving the distribution must be considered. In order to determine the United States tax payable on the distribution received by the electing shareholder, it is first necessary to determine the foreign tax credit which may be claimed on the distribution under I.R.C. §§ 901–905.[12] Without a calculation of the foreign tax credit, there can be no calculation of the overall tax on a particular distribution.

It appears that the tables in section 963(b) which determine the amount of the minimum distribution were designed for those distributions where there is a uniform rate of taxes deemed paid under section 902 per dollar of distribution received by the electing shareholder. In this situation there is an inverse relationship between the United States tax and the foreign tax.[13] While this relationship exists when the minimum distribution is received from a first tier corporation, it is not necessarily the case when a distribution is received from a chain or group of corporations. In simplified terms, the difference is due to the fact that the effective foreign tax rate for a chain or group of controlled foreign corporations included in a section 963 election is calculated on a consolidated basis,[14] while under the ordinary foreign tax credit rules the foreign tax credit is calculated based on the foreign tax rate of the corporation that actually makes the distribution.[15] The practical effect of the difference between distributions from first tier corporations and distributions from chains or groups is that receipt of a minimum distribution from a chain or group will not necessarily result in an overall tax which approximates the amount the shareholder would pay if it

11. *See* Section I, *supra.*

12. Under I.R.C. § 902(a), taxes paid by a first tier foreign corporation out of its earnings and profits are "deemed to have been paid" by the United States shareholder in the proportion that the distribution received by the shareholder bears to the distributing corporation's earnings and profits. Under I.R.C. § 78 the amount of the distribution received by the corporate shareholder is "grossed up" by the amount of foreign taxes deemed paid under section 902. The United States tax rate is applied to this grossed up distribution, then the amount of the foreign tax credit allowed under section 901 (including taxes deemed paid under section 902) is subtracted to determine the amount of the United States tax payable on the distribution.

13. For a discussion of the relationship between the foreign tax credit rules and the minimum distribution rules, see Note, Minimum Distribution, Inclusions of Subpart F Income, Related Foreign Tax Credit-Needed Simplification and Greater Equity-Planning, 29 Tax L.Rev. 185 (1973).

14. *See* note 7, *supra.*

15. Thus, a shareholder that made a group election and determined the effective foreign tax rate of the group to be 35 percent would be required under section 963(b)(3) to receive 63 percent of the group's consolidated earnings and profits as the minimum distribution. If the shareholder received an amount sufficient to meet the minimum distribution requirement from only one member of the group, however, and the foreign tax rate for the distributing corporation was 40 percent, the shareholder would receive a foreign tax credit under ordinary rules based on a 40 percent foreign tax rate rather than the 35 percent effective foreign tax rate. As a result, the distribution would not produce a level of taxation which meets the statutory requirement.

were taxed at the United States rates on its proportional share of the pretax earnings and profits of the foreign corporations included in its election. In other words, the distribution would not necessarily produce an overall tax that meets the statutory standard.

■ We think it is apparent from a review of the legislative history of section 963 that Congress had at least a preliminary understanding of the problems raised by the relationship between the minimum distribution formula and the foreign tax credit rules. The examples included in the Senate Finance Committee Report [16] and the remarks and examples provided by Senator Kerr on the floor [17] describe a method of allocating foreign tax credits on a consolidated basis when the minimum distribution is not made on a pro rata basis [18] from a chain or group of foreign controlled corporations. There is no explanation in the legislative history of what adjustments to the foreign tax credit rules Congress intended. We conclude that Congress left that decision to the administrative experts of the Treasury Department.

There is nothing in the legislative history, however, to indicate that the Congress believed that the ordinary foreign tax credit rules should not generally be applied to distributions from chains or groups. There is no evidence that Congress believed that the ordinary foreign tax credit rules should not be applied to chains or groups because to do so would impose an administrative burden. There is no indication that the Congress intended the ordinary foreign tax credit rules to be altered for shareholders making a chain or group election in order to give such shareholders a special incentive to receive distributions in excess of the minimum distribution. The legislative history merely shows that Congress was concerned with the possibility that an electing share-

holder could receive a minimum distribution from a chain or group but not incur an overall tax on the distribution that met the statutory standard.

■ Thus, in proceeding to our discussion of the regulations promulgated by the Secretary under the authority of section 963(f), we do not assume that Congress intended the statutory rules of I.R.C. §§ 901–905 to be generally displaced. We conclude that Congress intended these statutory rules to control unless the Secretary deemed it necessary to vary them in order to carry out the purposes of section 963. We reject plaintiff's argument that it was incumbent on the Secretary to expressly exclude distributions in excess of the minimum distribution from the scope of the regulations if that were his intention. The Secretary was given the authority to make exceptions to the ordinary tax credit rules. Distributions which do not fall under the exception are covered by the ordinary foreign tax credit rules. It is plaintiff's burden to show that the Secretary either expressly or by reasonable implication chose to except distributions in excess of the minimum distribution from the ordinary tax credit rules. We conclude that it has failed to meet this burden.

## B. Special Foreign Tax Credit Rules

■ The special rules which plaintiff applied in determining its foreign tax credit for the tax year at issue are found in Treas. Reg. § 1.963–4(b) and (c). It is unnecessary to discuss in detail the particular adjustments to the ordinary foreign tax credit rules mandated by these paragraphs of Treas.Reg. § 1.963–4. As a practical matter, these special rules are only relevant in two situations: (1) when some members of the chain or group covered by the section 963 election have earnings and profits for the year and others have a deficit in earn-

---

**16.** *See* Senate Report, *supra* note 6, at 271–272.

**17.** *See* 108 Cong.Rec., Part 14, pp. 18578–18579 (1962).

**18.** A distribution is made on a pro rata basis when each member of the chain or group dis-

tributes the statutory percentage (determined under section 963(b)) of its earnings and profits for the year. Such a distribution produces an overall tax which meets the statutory requirement. *See* 108 Cong.Rec., Part 14, p. 18579 ex. 3 (1962).

ings and profits for that year, or (2) when a distribution passes through more than one tier before it is received by the electing shareholder. Plaintiff's case concerns situation (1) described above. Plaintiff admits that the result of its application of the special rules in determining its foreign tax credit was to accelerate into the year of its section 963 election (1966) a portion of the foreign taxes deemed paid on the distributions received. It is this benefit which plaintiff claims was granted by the regulations.

Plaintiff places primary reliance on the language of Treas.Reg. § 1.963–4(c)(2)(i)(c). That portion of the regulation states:

(c) *Corporation with earnings and profits reduced by allocated deficits.* In the application of section 902, a United States shareholder's proportionate share of the earnings and profits for the taxable year of a foreign corporation to which the chain or group election applies shall reflect the reduction of such earnings and profits by deficits allocated thereto under paragraph (b)(2) of this section. No taxes paid or accrued by such corporation shall be deemed paid under section 902 with respect to a distribution to such shareholder from the earnings and profits of such corporation for such year to the extent that such distribution exceeds the shareholder's proportionate share as so reduced.

We agree, and the Government conceded at oral argument, that when read alone this language does not appear to be limited to determination of the foreign tax credit in respect to a minimum distribution. As we stated above, however, we do not consider the words in isolation when interpreting such regulatory language. We must also consider the context, the purpose, and the circumstances under which the words are used.

As we discussed in Part I, all electing shareholders must file an election, consent to the regulations promulgated under section 963(f), and receive the statutorily determined distribution in order to be eligible for the section 963 exclusion. The regula-

tions, however, impose an additional condition on those shareholders making a chain or group election. Treas.Reg. § 1.963–1(a)(2)(iii) requires such shareholders to incur income tax *with respect to the minimum distribution* sufficient to satisfy the requirements of Treas.Reg. § 1.963–4(a) relating to the minimum overall tax burden. The latter section of the regulations is described in Treas.Reg. § 1.963–1(a)(1) as follows:

Section 1.963–4 sets forth the requirement *with respect to a minimum distribution* from a chain or group that the overall United States and foreign income tax must equal either 90 percent of the United States corporate tax rate applied against pretax and predistribution earnings and profits or, with the application of the special rules set forth in that section, the total United States and foreign income taxes which would have been incurred in respect of a pro rata minimum distribution from the chain or group. [Emphasis supplied.]

It is clear from this language that the regulations contemplate that a shareholder might make a chain or group election, consent to the regulations, receive the minimum distribution mandated by section 963(b), but still be taxed under section 951. In order to be eligible for the section 963 exclusion, such a shareholder must show that its overall tax on the minimum distribution meets the standards of Treas.Reg. § 1.963–4(a).

The language of Treas.Reg. § 1.963–4(a) indicates that the minimum overall tax burden tests set out in that portion of the regulation were designed to remedy the limitations of the minimum distribution formula that we noted above. There are three alternatives. The first merely restates what we saw from the legislative history was the statutory standard—that the overall tax on the minimum distribution be at least 90 percent of the amount the shareholder would pay if it were taxed at the United States rate on its proportional share of the pretax earnings and profits of the corporations included in the election. The

second alternative requires that the shareholder receive the minimum distribution on a pro rata basis. The third alternative requires the shareholder to defer its foreign tax credit to the extent necessary to assure that its overall tax on the distribution equals the lower of the tax paid on a pro rata minimum distribution or the tax that would be paid if the shareholder was taxed at 90 percent of the United States rate on its proportional share of the pretax earnings and profits of the corporations included in the election.

The second and third formulations of the minimum overall tax burden test invoke the special rules which are at issue in this case. The introductory language of both Treas. Reg. § 1.963–4(b) and (c) limits its purpose to the determination of the minimum overall tax burden under paragraph (a)(1)(ii) of Treas.Reg. § 1.963–4.[19] The portion of the regulation relied upon by plaintiff, Treas. Reg. § 1.963–4(c)(2)(i)(c), is but a subparagraph of paragraph (c). As such, it is implicitly limited to the purpose of determining the minimum overall tax burden.

As we noted above, however, the minimum overall tax burden tests apply to the minimum distribution. *See* Treas.Reg. § 1.963–1(a)(1) and (a)(2)(iii). The purpose of the minimum overall tax burden tests is to assure that the overall tax incurred in respect to the minimum distribution meets the statutory standard. If the shareholder making a chain or a group election fulfills any one of the three alternative minimum overall tax burden tests, its overall tax on the minimum distribution will meet the statutory standard and it is entitled to the section 963 exclusion. If it fails to fulfill one of the tests, it is taxed under section 951. Distributions in excess of the minimum distribution are not covered by the minimum overall tax burden test. It fol-

lows, therefore, that the special rules, which are invoked in determining the minimum overall tax burden, do not apply to distributions in excess of a minimum distribution.

Application of the special rules in the manner proposed by plaintiff is based on the presumption that the special rules have a purpose independent of the minimum overall tax burden tests. Such an application results in an accelerated foreign tax credit for those shareholders, like plaintiff, that make a chain or group election and receive distributions in a year when one or more of the members of the chain or group have a deficit in earnings and profits. The reasons offered by plaintiff for granting such special treatment are unsupported by the legislative history of section 963. Even if the Treasury had intended that the special rules apply to all distributions, we fail to see why it would create rules which in effect only benefit chains and groups with one or more members with deficits in earnings and profits.

We conclude that the special rules were intended to be applied in respect to the minimum distribution as part of the second and third formulations of the minimum overall tax burden test. When the special rules are applied to the minimum distribution, no tax credit windfall is created. The adjustments merely allow the electing shareholder to make a pro rata minimum distribution that produces an overall tax that meets the statutory standard. When applied in this manner, the special rules are entirely consistent with the purpose of section 963.

Plaintiff is not penalized by the limitation of the special rules to determination of the foreign tax credit on the minimum distribution. Because of the effective foreign

---

19. Treas.Reg. § 1.963–4(b) begins as follows:

"(b) Special rules for determining earnings and profits and foreign income taxes. For purposes of determining the minimum overall tax burden under paragraph (a)(1)(ii) of this section, §§ 1.963–2 and 1.963–3 shall apply as modified by the following subparagraphs."

Treas.Reg. § 1.963–4(c) begins as follows:

"(c) Special foreign tax credit rules—

"(1) In general. In determining the minimum overall tax burden under paragraph (a)(1)(ii) of this section, the foreign tax credit of the United States shareholder with respect to the minimum distribution received for the taxable year from the chain or group shall be determined under the provisions of sections 901 through 905 as modified by section 1.963–3 except that * * *."

tax rate of plaintiff's group, it was not required to receive a minimum distribution. It was therefore automatically eligible for the section 963 exclusion and escaped taxation on the subchapter F income of the controlled foreign corporations. If plaintiff had not received any distributions from the corporations included in its group, it would have paid no tax. Since plaintiff did receive distributions in 1966 from the members of its group, plaintiff is taxed on those distributions, but it may claim the foreign tax credit under the ordinary rules of sections 901–905. Congress enacted section 963 as an escape valve which if complied with made section 951 inoperative. Our decision does not deny plaintiff the benefit intended by Congress. We conclude, however, that Congress did not intend that plaintiff receive special foreign tax credit benefits in respect to distributions in excess of the minimum distribution, and no such benefits were granted by the regulations promulgated under section 963(f).

C. Attribution of Distribution Received in 1967 to 1966

■ Plaintiff contends that under Treas. Reg. § 1.963–3 it properly attributed a distribution received in 1967 to the 1966 tax year and properly deemed that distribution to be from earnings and profits in respect to 1966. That section of the regulations is entitled "Distributions counting toward a minimum distribution." Plaintiff argues that any distribution meeting the four conditions of paragraph (a)(i)–(iv) may be counted toward a minimum distribution and treated accordingly.

Again, interpreting this language in the context of the regulatory scheme, we find plaintiff's interpretation to be unreasonable. As the introductory language of Treas.Reg. § 1.963–3 implies, its purpose is to differentiate between those distributions that are relevant in determining whether the electing shareholder has received an amount sufficient to meet the minimum distribution standard for a particular year and those which may not be "counted toward" the minimum distribution for that year. Plaintiff's minimum distribution for 1966 was zero. In this situation, this section of the regulations is irrelevant. It is patently unreasonably to apply these ordering rules to determine which distributions count toward zero. The question of what distributions count toward a minimum distribution never arises once it is determined that the amount of the minimum distribution is zero. Under these circumstances, the electing shareholder is automatically entitled to the section 963 exclusion without receiving a distribution.[20]

V. *Conclusion of Law*

We conclude that the special rules of Treas.Reg. § 1.963–4(b) and (c) do not apply for purposes of determining the foreign tax credit on distributions received by shareholders electing under section 963 that exceed the amount of the minimum distribution. We further conclude that the ordering rules of Treas.Reg. § 1.963–3 do not apply when the amount of the minimum distribution is zero. Accordingly, plaintiff is not entitled to recover and the petition is dismissed.

---

20. Plaintiff raises a number of arguments concerning Revenue Rulings issued by the Service, particularly Rev.Rul. 73–182, 1973–1 C.B. 350. Since plaintiff's minimum distribution for 1966 was zero, the factual issues raised by that Revenue Ruling are not relevant to our discussion. We need not consider the validity of the conclusions reached by the Service in that Ruling.